*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EZ MINOR, by Next Friends RICHARD HILLIKER and ALEXIS ZINK,

   Plaintiffs-Appellees,

and

VHS OF MICHIGAN, INC., doing business as DETROIT MEDICAL CENTER, and REGENTS OF THE UNIVERSITY OF MICHIGAN,

   Intervening Plaintiffs-Appellees,

v

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

   Defendant-Appellant,

and

FARMERS INSURANCE EXCHANGE,

   Defendant-Appellee.

UNPUBLISHED
October 01, 2025
9:56 AM

No. 371060
Wayne Circuit Court
LC No. 22-010532-NF

Before: GADOLA, C.J., and MARIANI and TREBILCOCK, JJ.

PER CURIAM.

  This no-fault action arises from catastrophic injuries EZ, a young child, sustained in a car accident while a passenger in a vehicle owned and driven by her maternal grandmother. At the time of the accident, EZ's mother did not have an automobile insurance policy, but EZ's maternal grandmother had one with defendant State Farm Mutual Automobile Insurance Company. At issue in this appeal is whether EZ was domiciled at her maternal grandmother's home or named in the applicable insurance policy when the accident occurred, such that EZ was eligible to recover

personal protection insurance ("PIP") benefits from State Farm under the no-fault act, MCL 500.3101 *et seq.* In response to the parties' competing motions for summary disposition below, the trial court answered this question in the affirmative, finding State Farm to be the highest-priority insurer. For the reasons set forth in this opinion, we reverse and remand for further proceedings.

## I. BACKGROUND

## A. FACTUAL BACKGROUND

EZ's maternal grandmother, Candice Renee Reeves ("Reeves"), lived in a house in Capac, Michigan (the "Capac Address").[1] Reeves's daughter, Alexis Zink ("Zink")—who is EZ's mother—also lived at the Capac Address for much of her life. Immediately after giving birth to EZ in 2020, however, Zink moved into a house in Yale, Michigan (the "Yale Address"). Zink rented the Yale Address from her grandparents, who specifically bought it as a place for Zink and EZ to live. Although Zink's grandparents charged rent, there was no formal rental agreement between them, and they were lenient when she failed to pay.

When the accident occurred in 2022, Reeves lived at the Capac Address with her husband and their two other children. Zink, EZ, and EZ's father—Richard Hilliker ("Hilliker")—lived at the Yale Address.[2] However, Zink's relationship with Hilliker had "been going downhill" in the six months preceding the accident, and Zink had been "trying to come up with a game plan and get things all in order" so that she and EZ "could leave or figure something else out." As part of this plan, Zink intended to move back to the Capac Address permanently. Zink and EZ thus began "transitioning" to the Capac Address sometime around December 2021, including moving some belongings there. Accordingly, Zink described the Yale Address as the one where she and EZ "currently resided" when the accident occurred but "not the [address] that [they] had intended to be in."

Zink and EZ "both had a lot of stuff" at the Capac Address before the accident. For example, EZ's designated bedroom there contained a crib and a small bed; dressers; clothes; toys and "blankies"; and supplies such as diapers, bottles, formula, wipes, and pacifiers. For her part, Zink had clothes and "all [her] care stuff" there, and she was gradually starting to take over other items and "working on moving things slowly." Though it is unclear whether Zink slept in EZ's room when they stayed at the Capac Address, she kept her belongings—most of which she moved from the Yale Address's garage—in EZ's room and the basement. In addition to having belongings at the Capac Address, Zink generally claimed she received "some" bills and other mail there before the accident. However, she could not provide specific details regarding the source of this mail or why she received it there.

---

[1] The police report of the accident indicates Reeves lived in Mussey, Michigan. According to Reeves and Zink, Capac and Mussey refer to the same city and are used interchangeably.

[2] Though Zink and Hilliker never married, and no formal custody order was in place when the accident occurred, Zink always "had custody" of EZ.

The utilities at the Yale Address were in Zink's name, but Hilliker and Reeves helped her pay for them. Hilliker also helped Zink pay the rent. More generally, although Zink generally worked, she and EZ were "dependent on" Hilliker's and Reeves's financial support. Zink also relied on Reeves for other forms of support, such as transportation and child care. According to Zink, Reeves had EZ in her care and custody "[p]retty much daily" before the accident, and would "sometimes" have EZ "for almost a week at a time." Zink also spent the night at the Capac Address "numerous times" each week in the months preceding the accident, though she could not recall the exact number of days.

## B. PROCEDURAL HISTORY

In September 2022, Zink and Hilliker, as next friends of EZ (collectively, "plaintiffs"), instituted this action by filing a complaint against State Farm and the Michigan Automobile Insurance Placement Facility ("MAIPF"), seeking payment of first-party no-fault benefits. The following month, Zink filed an application for PIP benefits with the MAIPF on EZ's behalf. The trial court later entered a stipulated order substituting defendant Farmers Insurance Exchange ("Farmers") in place of the MAIPF. Intervening plaintiff VHS of Michigan, Inc., doing business as Detroit Medical Center ("DMC"), eventually filed an intervening complaint seeking repayment from either State Farm or Farmers for certain medical services it provided EZ.

Ultimately, Farmers, DMC, plaintiffs, and State Farm each moved for summary disposition under MCR 2.116(C)(10). Through those motions, the parties disputed, in pertinent part, (1) whether DMC and plaintiff could maintain claims against Farmers, and (2) whether there was a genuine issue of material fact that EZ was domiciled with Reeves at the Capac Address when the accident occurred, such that State Farm was the highest-priority insurer responsible for the payment of EZ's no-fault claims. After the parties filed their motions for summary disposition and responsive pleadings, intervening plaintiff Regents of the University of Michigan ("Regents" and, together with DMC, "intervening plaintiffs") filed an intervening complaint seeking reimbursement from State Farm or Farmers for medical services provided to EZ.

At the hearing on the summary-disposition motions, the trial court analyzed each of the domicile factors set forth in *Workman v Detroit Auto Inter-Ins Exch*, 404 Mich 477; 274 NW2d 373 (1979), and *Dairyland Ins Co v Auto Owners Ins Co*, 123 Mich App 675; 333 NW2d 322 (1983), and found that all but two weighed in favor of Zink, and thus EZ, being domiciled at the Capac Address at the time of the accident. Additionally, the trial court expressed its apparent belief that State Farm failed to meet the burden of supporting its motion for summary disposition. So it entered orders, in relevant part: (1) denying State Farm's motion for summary disposition as to plaintiffs' and intervening plaintiffs' claims; (2) granting plaintiffs' motion for summary disposition; (3) granting Farmers's motion for summary disposition and dismissing it as a party; and (4) granting DMC's motion for partial summary disposition. After State Farm unsuccessfully moved for reconsideration,[3] it filed an application for leave to appeal in this Court, which this

---

[3] In its motion for reconsideration, State Farm provided, for the first time, numerous records purportedly supporting its position that Reeves's insurance policy did not apply to EZ. We have not considered this evidence when analyzing the propriety of the trial court's resolution of the

-3-

Court granted. *EZ Minor v State Farm Mut Auto Ins Co*, unpublished order of the Court of Appeals, entered November 4, 2024 (Docket No. 371060).

## II. ANALYSIS

At issue on appeal is the trial court's resolution of the parties' motions for summary disposition, each of which were brought under MCR 2.116(C)(10) and addressed, in relevant part, whether State Farm was responsible for the payment of no-fault benefits to EZ in connection with the accident.

This Court "review[s] de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "A motion for summary disposition submitted pursuant to MCR 2.116(C)(10) tests the factual sufficiency of a claim." *Wilmore-Moody v Zakir*, 511 Mich 76, 82; 999 NW2d 1 (2023). "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *El-Khalil*, 504 Mich at 160. "A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact." *Id*. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Gueye v State Farm Mut Auto Ins Co*, 343 Mich App 473, 481; 997 NW2d 307 (2022) (quotation marks and citation omitted). "Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party." *Anderson v Transdev Servs, Inc*, 341 Mich App 501, 507; 991 NW2d 230 (2022) (quotation marks and citation omitted).

The general rule for determining whether a Michigan insurer is liable for PIP benefits is set forth in MCL 500.3114(1), *Grange Ins Co of Mich v Lawrence*, 494 Mich 475, 490; 835 NW2d 363 (2013), which provides that, subject to certain exceptions, a PIP insurance policy "applies to accidental bodily injury to the person named in the policy, the person's spouse, and a relative of either domiciled in the same household, if the injury arises from a motor vehicle accident," MCL 500.3114(1). Here the parties dispute whether EZ was domiciled in Reeves's household or included in her policy at the time of the accident, such that EZ is entitled to PIP benefits under her policy.

### A. EZ'S DOMICILE

On appeal, State Farm argues that the trial court erred by concluding that no genuine issue of material fact existed that Zink—and, thus, EZ—was domiciled at the Capac Address at the time of the accident. We agree.

---

summary-disposition motions, however, because that evidence was not before the trial court when it decided the motions. See *Maiden v Rozwood*, 461 Mich 109, 126 n 9; 597 NW2d 817 (1999) (declining to consider evidence on appeal that the plaintiff provided the trial court for the first time *after* it decided the dispositive motion, explaining that, "[i]n ruling on a motion for summary disposition, a court considers the evidence then available to it").

"Generally, a domicile determination is a question of fact, and this Court will not reverse the trial court's determination unless the evidence clearly preponderates in the opposite direction." *Corbin v Meemic Ins Co*, 340 Mich App 140, 145; 985 NW2d 217 (2022) (quotation marks and citation omitted). But as here, "[w]here the underlying facts are not in dispute, . . . the determination of domicile is a question of law that this Court reviews de novo." *Id*.

Although the no-fault act does not define "domiciled," Michigan courts use the common-law meaning. *Grange*, 494 Mich at 492-493. Accordingly, the term "domicile" means "the place where a person has his true, fixed, permanent home, and principal establishment, and to which, whenever he is absent, he has the intention of returning." *Id*. at 493 (quotation marks and citation omitted). A domicile is "acquired by the combination of residence and the intention to reside in a given place . . . ." *Id*. at 495 (quotation marks and citation omitted; omission in original). "If the intention of permanently residing in a place exists, a residence in pursuance of that intention, however short, will establish a domicile." *Id*. (quotation marks and citation omitted). "The traditional common-law inquiry into a person's 'domicile,' then, is generally a question of intent, but also considers all the facts and circumstances taken together." *Id*. Notably, Michigan courts distinguish between a person's *residence* and *domicile*—while a person may have more than one residence, he or she can only have one domicile at a time. *Id*. at 494-495. The same is true of minor children, regardless of their parents' marital status or the children's "multiple legal residences." *Id*. at 495.

"Our common law recognizes three means of acquiring a domicile, which are generally applicable to all persons depending on the factual circumstances, including: (1) domicile of origin or of nativity; (2) domicile of choice; and (3) domicile by operation of law." *Id*. at 501. A determination of an adult's domicile generally focuses on intent. *Id*. at 502-503. Because "a child lacks the capacity to acquire a domicile of choice," however, "a child's intent regarding domicile" and "the traditional factors applied in determining an adult's domicile" are irrelevant. *Id*. at 503. Instead, a child's domicile is determined by that of his or her parents. *Id*. As our Supreme Court has explained: "[W]hen a child is born, the child acquires a domicile of origin, which is that of his [or her] father. The child's domicile of origin remains the child's domicile until a new domicile is acquired through the actions of the child's parents or until that point in time when the minor, either through emancipation or by reaching the age of majority, can acquire a domicile of choice." *Id*. (citations omitted).

Considering Zink's testimony that she and EZ moved into the Yale Address immediately after EZ's birth, there can be no real dispute that the Yale Address was EZ's domicile of origin. The question, then, is whether Zink's actions resulted in EZ acquiring a new domicile at the Capac Address by the time of the accident. To answer this question, we must analyze Zink's domicile at that time.

When analyzing whether a person is domiciled in the same household as an insured for purposes of MCL 500.3114(1), Michigan courts evaluate the following factors adopted from *Workman*, 404 Mich at 495-497:

> (1) the subjective or declared intent of the person of remaining, either permanently or for an indefinite or unlimited length of time, in the place he contends is his "domicile" or "household"; (2) the formality or informality of the relationship

between the person and the members of the household; (3) whether the place where the person lives is in the same house, within the same curtilage or upon the same premises, (4) the existence of another place of lodging by the person alleging "residence" or "domicile" in the household. . . . [*Grange*, 494 Mich at 497 (quotation marks and citation omitted; omission in original).]

The *Workman* factors constitute a "flexible multi-factor test," and "no one factor is determinative." *Id*. Moreover, the *Workman* factors "do not make a comprehensive and exclusive list; they are merely [a]mong the relevant factors to be considered." *Cervantes v Farm Bureau Gen Ins Co of Mich*, 272 Mich App 410, 415; 726 NW2d 73 (2006) (quotation marks and citation omitted; alteration in original).

Michigan courts also evaluate the following additional factors, adopted from *Dairyland*, 123 Mich App at 682, which focus in particular on adult children of an insured:

[1] whether the claimant continues to use his parents' home as his mailing address, [2] whether he maintains some possessions with his parents, [3] whether he uses his parents' address on his driver's license or other documents, [4] whether a room is maintained for the claimant at the parents' home, and [5] whether the claimant is dependent upon the parents for support. [*Grange*, 494 Mich at 497 n 41 (quotation marks and citation omitted; alterations in original).]

"The *Workman-Dairyland* multifactored framework comprises the one now commonly employed by Michigan courts when a question of fact exists as to where a person is domiciled." *Id*.

We conclude the *Workman* factors, on balance, demonstrate Zink was domiciled at the Yale Address when the accident occurred. First, Zink had a subjective or declared intent to stay at the Yale Address indefinitely at that time. True, Zink testified that, when the accident occurred, she intended to move back to the Capac Address permanently; had expressed this intent to her grandmother and Reeves; and had begun slowly taking actions to bring this intent to fruition, such as gradually moving some of her and EZ's belongings to the Capac Address. However, Zink also testified that, at the same time, she and EZ still lived at the Yale Address, and she did not consider herself financially able to "fully" leave the Yale Address. Zink further testified that she *wanted* to live at the Capac Address in the months before the accident, not that she *actually* lived there. Accordingly, the record demonstrates that, at most, Zink had a subjective or declared intent to change her and EZ's domiciles to the Capac Address at some undetermined time in the future but had not yet done so before the accident.

Second, though there is little evidence in the record regarding the formality of Zink's relationship with Reeves as it related to Zink and EZ staying at the Capac Address, the relationship appeared informal—for example, there is no indication Zink's stays at the Capac Address involved any rental agreement or the payment of rent, and the utilities there were not in her name. By contrast, Zink paid her grandparents rent to stay at the Yale Address (though they were lenient when she failed to pay), and Zink put the utilities at the Yale Address in her name and paid them, with Hilliker's help.

Finally, as to the third and fourth *Workman* factors, it is unclear how often Zink stayed at the Capac Address in the months before the accident. Indeed, Zink claimed she stayed at the Capac Address "numerous times" each week in the months preceding the accident, but could not "really remember" the exact number of days; instead, she merely described staying there "quite often." Even so, by her own admission, she and EZ resided at the Yale Address, 15 miles away from the Capac Address, at the time of the accident. Thus, Zink had another place of lodging that was not in the same house, within the same curtilage, or upon the same premises as the Capac Address.

The *Dairyland* factors likewise demonstrate, on balance, that Zink was domiciled at the Yale Address at the time of the accident. First, although Zink testified that she received "some" bills and other mail at the Capac Address before the accident, she could not specifically describe any such mail except unidentified medical bills, and she did not remember whether she received mail at the Capac Address merely because she failed to update her address to the Yale Address when she moved there after EZ's birth. Similarly, though Zink claimed she began notifying certain parties that she changed her address to the Capac Address sometime in the months preceding the accident, she identified doing so because she *wanted* to live at the Capac Address, not because she had moved there. Moreover, she could not specifically identify any person or entity to which she sent such a notification, nor how much mail she received at the Capac Address after doing so. Notably, the only address she could specifically remember using for her contact information when registering for various schooling programs in the months before the accident was the Yale Address.

Second, Zink testified that she moved clothes, personal care items, and other belongings to the Capac Address before the accident. However, "most" of these items came from the Yale Address's garage, which indicates they were not her primary belongings. Similarly, though Zink testified that EZ had everything she needed at the Capac Address, there is no indication that Zink actually brought anything for EZ to the Capac Address, as opposed to Reeves merely keeping her own supplies for EZ there because Reeves frequently babysat her. This factor is thus, at most, neutral.

Third, there is no indication Zink used the Capac Address on her driver's license at the time of the accident. Zink testified that she did not know which address was listed on her driver's license on the date of the accident; whether she changed the address on her license back to the Capac Address at any point after moving to the Yale Address; or when the driver's license she had at the time of her deposition testimony a year after the accident—which bore the Yale Address—had been issued. Nor is there any indication Zink used the Capac Address on other documents. Though Zink could not remember which addresses she used when registering for certain schooling programs, as mentioned, the only address she could specifically remember using for such purposes before the accident was the Yale Address.

Fourth, there is no indication Reeves maintained a room for Zink at the Capac Address. When asked whether anyone other than Reeves and Reeves's husband lived there before the accident, Zink only listed her siblings, not herself or EZ. According to Zink, the four bedrooms at the Capac Address were split between Reeves and her husband; Zink's siblings; and EZ. Although Zink's testimony arguably indicated that she slept in a bed in EZ's room when Zink stayed at the Capac Address, she never identified having her own room there. As to the fifth, and final, *Dairyland* factor, the record indicated that Zink was dependent on support from both Reeves, who

lived at the Capac Address, and Hilliker, who lived at the Yale Address. Accordingly, she was not solely dependent on Reeves for support.

As a final matter, although the focus of this analysis is on Zink, not EZ, we find it significant that (1) in the MAIPF application, Zink listed EZ's address at the time of the accident as the Yale Address; (2) at her deposition approximately a year after the accident, Zink testified that EZ had never lived anywhere but the Yale Address; and, (3) on the day of the accident, Reeves picked up EZ *from the Yale Address* to take her to the Capac Address to watch her.

Considering all of this, there is no genuine issue of material fact that, at the time of the accident, Zink (and, thus, EZ) was domiciled at the Yale Address. At most, the record demonstrates Zink's intention to *become domiciled* at the Capac Address at some indeterminate time in the future. However, she had not changed her domicile at the time of the accident. Indeed, the record demonstrates that, before the accident, Zink maintained her "true, fixed, permanent home, and principal establishment" at the Yale Address, *Grange*, 494 Mich at 493 (quotation marks and citation omitted); visited the Capac Address and began preparing to move there but nonetheless intended to return to the Yale Address after each visit, *id.*; and had not yet resided at the Capac Address for any period of time *with the intention of permanently staying there*, *id*. at 495. Accordingly, EZ's domicile remained her domicile of origin—the Yale Address. *Id*. at 503 (explaining a child's domicile of origin "remains the child's domicile until," as pertinent here, "a new domicile is acquired through the actions of the child's parents"). The trial court thus erred to the extent it concluded, as a matter of law, that EZ was domiciled at the Capac Address at the time of the accident and, therefore, entitled to PIP benefits under Reeves's policy with State Farm.

## B. WHETHER EZ WAS NAMED IN REEVES'S POLICY

State Farm next argues the trial court erred to the extent it concluded EZ was a named insured under Reeve's insurance policy with State Farm. We again agree.

As this Court has recognized, there is a burden-shifting framework associated with motions for summary disposition brought under MCR 2.116(C)(10), pursuant to which "the moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence. The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists." *Tripp v Baker*, 346 Mich App 257, 262; 12 NW3d 45 (2023) (quotation marks and citation omitted).

The trial court apparently believed State Farm failed to meet its initial burden because, in the trial court's view, (1) there was no language in Reeves's policy excluding Zink from coverage, (2) the policy period of the certified policy State Farm provided did not apply to the date of the accident, and (3) an excerpt from State Farm's relevant claim file identified Zink and EZ as insureds under Reeves's policy. Though it is unclear how much weight the trial court gave these findings, they are nonetheless significant because, as already discussed, a PIP insurance policy applies, in relevant part, "to accidental bodily injury to the person named in the policy . . . ." MCL 500.3114(1). And in our view, the trial court's conclusions regarding Reeves's insurance policy are unsupported by the record.

First, because it is undisputed that Reeves, not Zink, was driving Reeves's vehicle at the time of the accident, it is unclear how the excluded driver endorsement—which excludes a listed person from coverage when such person drives the insured's vehicle—is even relevant to the applicability of Reeves's insurance policy to EZ. Regardless, the certified policy provided by State Farm did indicate Zink was an excluded driver. More specifically, although the driver exclusion endorsement did not list Zink, she was identified in the declarations page as an excluded driver for purposes of the endorsement. This is the only time Zink's name appears in Reeves's policy.

Second, the cover page to the certified policy record, signed by the applicable State Farm records custodian, expressly states that the accompanying policy was in effect on the date of the accident. The cover page further explains why the attached declarations page bears a policy period preceding the date of the accident: "It is State Farm's business practice to print a new Declarations Page only when a policy issuance transaction such as a change of coverage occurs. Therefore, the included Declarations Page which was in effect at the time of the loss will indicate the policy period of the last policy issuance transaction." There is no evidence in the record contradicting this statement or otherwise indicating that a policy-issuance transaction later occurred that rendered the declarations page inapplicable to the time of the accident. Thus, the uncontroverted evidence in the record indicates the certified policy State Farm provided the trial court was in effect at the relevant time.

Third, and finally, the claim-file excerpt plaintiffs provided does not demonstrate that Zink and EZ were named insureds in Reeves's policy. A section listing people associated with Reeves's vehicle identifies Zink and EZ as "Insured" and "Insured Passenger," respectively. This noticeably differs from Reeves and Reeves's husband, however, who are listed as "Named Insured Driver" and "Named Insured," respectively. There is nothing in the claim file, or otherwise in the record, indicating the references associated with Zink and EZ meant they were insured *under Reeves's policy*, as opposed to generally insured through other means, such as health insurance or other no-fault coverage. This is especially true considering an explanation of review relative to services DMC provided to EZ states that State Farm's investigation "determined that a health care policy is primary," and neither Zink nor EZ are listed as named insureds anywhere in Reeves's policy. Plaintiffs' contention that the claim excerpt demonstrates that Zink and EZ were named insureds in Reeves's insurance policy is therefore mere speculation and, thus, insufficient to establish a genuine issue of material fact. *Ahmed v Tokio Marine America Insurance Company*, 337 Mich App 1, 7; 972 NW2d 860 (2021).

In sum, the trial court erred to the extent it concluded, as a matter of law, that EZ, Zink, or both were named in Reeves's insurance policy.[4]

---

[4] In light of our resolution of these issues, we need not take up State Farm's additional arguments concerning the trial court's denial of State Farm's motion for reconsideration.

## III. CONCLUSION

For these reasons, we reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Philip P. Mariani
/s/ Christopher M. Trebilcock